*Clayton Daman Colkley v. State of Maryland*, No. 833, September Term 2019.

**CRIMINAL LAW > TRIAL; RECEPTION OF EVIDENCE; CROSS-EXAMINATION AND IMPEACHMENT**

When a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness. Md. Rule 5-806(a).

**CRIMINAL LAW > TRIAL; RECEPTION OF EVIDENCE; CROSS-EXAMINATION AND IMPEACHMENT**
**CRIMINAL LAW > EVIDENCE; JUDICIAL NOTICE; RECORDS**

When a hearsay declarant has a *per se* impeachable prior conviction and is unavailable for cross-examination, refusal to judicially notice the prior conviction is an abuse of discretion where the record indicates that the trial court did not engage in the requisite balancing test to determine whether the prejudice of admitting the conviction outweighed the probative value.

**CRIMINAL LAW > REVIEW; IN GENERAL; HARMLESS ERROR**

Any error in failing to admit an unavailable hearsay declarant's prior drug related conviction to impeach his prior recorded interview with police was harmless beyond a reasonable doubt where the jury also heard recorded testimony from the declarant in which he admitted to being high on cocaine during the interview and professed his lack of credibility and motive to lie to police.

**CRIMINAL LAW > EVIDENCE; OTHER MISCONDUCT BY ACCUSED; IN GENERAL**

While evidence of a defendant's past crimes or wrongful acts is generally inadmissible, such evidence may be admitted where that evidence is substantially relevant to some contested issue in the case and is not offered to prove guilt based on propensity to commit crimes.

**CRIMINAL LAW > REVIEW; DISCRETION OF LOWER COURT**

Where the record demonstrates that the trial court fully considered the issues presented in ruling on an objection, the trial court does not *ipso facto* abuse its discretion by failing to articulate its specific reasoning for denying the objection.

**CRIMINAL LAW > EVIDENCE; OTHER MISCONDUCT BY ACCUSED; IN GENERAL; OTHER MISCONDUCT SHOWING MOTIVE**

Trial court properly allowed testimony which implicated Appellant's involvement in two additional murders where the testimony was offered to establish Appellants motive and consciousness of guilt for the crimes alleged.

**CRIMINAL LAW > EVIDENCE; EVIDENCE FROM PRIOR PROCEEDINGS**

The trial court did not abuse its discretion in declining to redact the phrase "ladies and gentlemen of the jury" from a witness's prior recorded testimony. While the inclusion of that phrase may have alerted the jury that Appellant was previously tried, it did not reveal whether that trial resulted in a conviction.

**CRIMINAL LAW > EVIDENCE; HEARSAY**

Assuming *arguendo* that a police officer's characterization of a statement made to police was hearsay, that officer's testimony was nevertheless admissible because Appellant opened the door to the inquiry by mischaracterizing the statement that was made to police.

**CRIMINAL LAW > COUNSEL; ARGUMENTS AND STATEMENTS BY COUNSEL; COMMENTS ON EVIDENCE OR WITNESSES**

Prosecutor's comments during closing argument which characterized a witness's testimony as "real," "raw," and "pure" did not exceed the permissible bounds of a prosecutor's ability to comment on the credibility of the witnesses presented during closing remarks.

**CRIMINAL LAW > COUNSEL; ARGUMENTS AND STATEMENTS BY COUNSEL; COMMENTS ON EVIDENCE OR WITNESSES**

Trial court did not abuse its discretion by treating the prosecutor's remark during rebuttal – that if the missing witnesses had "something important that they have to say, it would have come out in this trial" – as rhetorical flourish.

**CRIMINAL LAW > REVIEW; DISCRETION OF LOWER COURT; CONDUCT OF TRIAL IN GENERAL; JURY; SELECTION AND IMPANELING**

Trial court did not abuse its discretion in declining to propound Appellant's proposed *voir dire* question asking whether prospective jurors had strong feelings about drugs where the defendant was not charged with any drug related offenses.

Circuit Court for Baltimore City
Case No.    103216074
            103216078
            103216080

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 833

September Term, 2019

_____

CLAYTON DAMAN COLKLEY

v.

STATE OF MARYLAND

_____

Kehoe,
Berger,
Reed,


JJ.[1]

_____

Opinion by Reed, J.

_____

Filed:  July 2, 2021

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

---

[1]    Judge Kathryn G. Graeff and Judge Andrea M. Leahy, did not participate in the Court's decision to report this opinion pursuant to Md. Rule 8–605.1.

This case stems from a shooting that occurred on the 1700 block of Port Street in Baltimore on May 28, 2003 (the "Incident"). During the Incident, four individuals were shot, one of whom was fatally wounded. In 2003, the State of Maryland (the "State") indicted Clayton Colkley ("Appellant") for his alleged involvement in the Incident. The charges against Appellant included, *inter alia*, attempted first-degree murder of William Courts, conspiracy to murder William Courts, and first-degree murder of James Bowens. This appeal comes from Appellant's convictions at his fifth trial. Appellant's first and second trial each resulted in convictions, but those convictions were each subsequently reversed and remanded for a new trial. Appellant's third and fourth trials each resulted in a mistrial. In the trial relevant to this appeal, the jury found Appellant guilty of attempted first-degree murder of William Courts, conspiracy to murder William Courts, and unlawfully carrying a handgun. Appellant timely appealed.

In bringing his appeal, Appellant presents six (6) questions for appellate review, which we have rephrased for clarity:[2]

---

[2] Appellant posed the following six (6) questions for review:

I.  Did the court err by precluding impeachment of a hearsay declarant?

II. Did the court err by allowing evidence that Appellant was responsible for two additional murders?

III. Did the court err by allowing evidence that revealed that Appellant had been twice previously tried?

IV. Did the court err by allowing hearsay?

V.  Did the court abuse its discretion by allowing impermissible closing argument and rebuttal?

I.  Did the trial court err in declining to take judicial notice of an unavailable hearsay declarants' prior conviction?

II.  Did the trial court abuse its discretion by allowing testimony which implicated Appellant's involvement in two other murders?

III.  Did the trial court abuse its discretion by allowing the jury to view video footage of two witnesses' prior testimony, rather than only an audio recording or transcript of that testimony, where the video footage revealed that the witnesses had testified in two prior trials?

IV.  Did the trial court abuse its discretion by allowing Det. Snead to testify to statements made by an alleged witness (Campbell) to the shooting who was not called to testify at trial?

V.  Did the trial court abuse its discretion by allowing statements, by prosecutors for the State during closing argument/rebuttal, pertaining to the credibility of certain witnesses and the standard of proof?

VI.  Did the trial court abuse its discretion by declining to propound Appellant's proposed voir dire question asking whether prospective jurors had strong feelings about illegal drugs?

For the following reasons, we affirm Appellant's convictions.

### FACTUAL & PROCEDURAL BACKGROUND

This case stems from a shooting that occurred on the 1700 block of Port Street in Baltimore on May 28, 2003. During the Incident, four individuals were shot,[3] one of whom – James Bowens – was fatally wounded.

---

VI.  Did the court err by declining to ask prospective jurors whether they held strong feelings about drugs?

[3]  James Bowens, William Courts, Edwin Boyd, and Yvette Hollie were shot during the Incident. Bowens was shot once in the chest and died within minutes. Courts was shot several times in the torso, arms, and legs; Boyd was shot in the eye; and Hollie was shot in the shoulder – all three survived.

2

In 2003, based on his alleged involvement in the Incident, Clayton Colkley (Appellant) was indicted for attempted first-degree murder (and lesser-included offenses) of William Courts; conspiracy to murder William Courts; first-degree murder (and lesser-included offenses) of James Bowens; and related firearms offenses. Appellant's first two trials were reversed and remanded for a new trial. Thereafter, Appellant's third and fourth trials each resulted in a mistrial. This appeal stems from Appellant's convictions following his fifth trial.

### Procedural Background

In Appellant's first trial (2005), Appellant was jointly tried with his then co-defendant Darnell Fields. Appellant was convicted of second-degree murder of Bowens; attempted first-degree murder of Courts; conspiracy to murder Courts, use of a handgun in the commission of a crime of violence; and wearing or carrying a handgun. However, we reversed and remanded for a new trial because Appellant had not been present when the trial court had disposed of a jury note. *Fields v. State*, 172 Md. App. 496, *cert. denied*, 399 Md. 33 (2007).

Following a joint retrial in 2010, Appellant was convicted of the same crimes, and an additional count of wearing or carrying a handgun. However, the Court of Appeals reversed those convictions and remanded for a new trial. *See Fields v. State*, 432 Md. 650 (2013) (Holding that the trial court erred in denying the defense the opportunity to inspect internal investigation files related to prior misconduct by two detectives who worked on the case; and holding that the trial court erred in not allowing cross-examination of the detectives regarding that misconduct.).

3

In September 2015, Appellant's third trial commenced. A mistrial was declared after the State elicited from a witness that Fields – Appellant's prior co-defendant – had been charged and convicted in relation to Appellant's case.

In September 2018, Appellant's fourth trial resulted in another mistrial after a State's witness referred to a prior trial while testifying.

This appeal comes from Appellant's fifth trial which commenced on January 22, 2019. At the conclusion of Appellant's fifth trial, the jury found Appellant guilty of attempted first-degree murder of William Courts, conspiracy to murder William Courts, and carrying a handgun. The jury found Appellant not guilty of second-degree murder of James Bowens and a second count of carrying a handgun. Appellant timely appealed his conviction, contending that multiple errors in the proceeding below warrant the reversal of his convictions.

## *Trial Below: Witnesses and Evidence*

At Appellant's fifth trial, the State again presented its theory of the case. Under the State's theory, Appellant and three other men drove to the 1700 block of Port Street for the purpose of killing William Courts at the behest of a large-scale drug supplier – Eric Horsey. The State asserted that Horsey had a motive to kill Courts because, according to Horsey, Courts and/or his brother – David Courts – had killed Horsey's friend and shot Horsey's brother. The State alleged that Horsey placed a bounty on William Courts, which Appellant sought to collect by shooting Courts on the night of the Incident. Conversely, Appellant's defense argued at trial that Appellant was not involved in the shooting, and that the State's witnesses were falsely accusing him for personal gain.

4

The State's primary civilian witnesses at trial were Eric Horsey, Qonta Waddell (deceased), Jermaine Lee, and Edwin Boyd (deceased). Yvette Hollie testified in support of Appellant. Additionally, Detectives Massey and Snead – who participated in the investigation of Appellant – testified for the State.

### a) Eric Horsey

Eric Horsey testified extensively in Appellant's second trial in 2010 while in federal custody. Between 2000 and 2006, Horsey was a large-scale drug supplier, making $10,000-$30,000 per month.

In January of 2003, Horsey's friend and brother were shot, allegedly by William Courts, outside a club called the "Teamsters Hall." In response, Horsey went to Courts' neighborhood – including the 1700 block of Port Street – seeking to retaliate. Horsey later testified that he would have killed someone "[i]f that's what it took" to get revenge. Horsey frequented the Port Street area with others over the course of a month. Horsey testified that, during this time, he "shot quite a few individuals," but no one was killed.

In 2006, Horsey was arrested on federal conspiracy charges which carried a potential penalty of life imprisonment. However, Horsey reached an agreement to receive only a ten-year mandatory-minimum sentence. In return, Horsey agreed to testify against all alleged co-conspirators and to provide "substantial assistance."

Although Horsey testified in the present trial, the court found that he was feigning memory loss and declared him unavailable as a witness. Accordingly, the State played a video recording of Horsey's prior testimony from Appellant's second trial in 2010.

Horsey testified in 2010 that Appellant proposed to kill one of the Courts brothers

5

in exchange for financial compensation. Horsey stated that he agreed on the condition that Appellant would not implicate Horsey. The next day, Horsey withdrew the offer after word had spread that he had "put bounties . . . on the Courts brothers." However, after Appellant adamantly denied telling anyone of their arrangement, Horsey confirmed their original agreement on the condition that Appellant would "take care of it" by the end of the weekend.

Horsey testified that Appellant contacted him two months later stating that he had "killed Little Will" and "another guy" on Port Street. Horsey further testified that Appellant told him that Appellant had driven to Port Street with three other people[4] intending to shoot "Billy" (Broderick Campbell), who had previously threatened them. However, when they got to Port Street Appellant said they did not see Campbell, so they started shooting at other people. According to Horsey, Appellant said that he "shot the first dude that was in his way," while "Bee" (Brian Smith) shot William Courts and Campbell shot Boyd. Horsey subsequently discovered that William Courts had been shot but was not dead. Horsey testified that Appellant asked if he could receive partial payment, but Horsey declined.

In his 2010 testimony, Horsey was also permitted to testify to his knowledge of Appellant's involvement in the deaths of David Courts and Edwin Boyd.

#### b) *Qonta Waddell*

Qonta Waddell's relevant testimony comes from his recorded interview with police

---

[4]     According to Horsey's testimony, Appellant referred to the three individuals as "E-Money Bags" (Edwin Boyd), "Bee" (Brian Smith), and "Got Proof" (Guy Pruitt).

on July 3, 2003, and his testimony in Appellant's first trial in 2005. Waddell agreed to cooperate with the police after he was charged with possession of three handguns.

In his 2003 recorded interview, Qonta Waddell told police that at the time of the Incident he was on the 1700 block of Port Street with William Courts and James Bowens when a car pulled up. Waddell stated that he saw four armed men in the car: "Coco" (Appellant), "Pooh" (Darnell Fields), "Edward" (Edwin Boyd), and another person whom he did not know. Waddell recalled that Bowens recognized the driver and proceeded to walk up to the vehicle. According to Waddell, Appellant exited the car and shot Bowens, and "[t]hen he shot [William Courts], who was shooting down the street at the crowd." Waddell also recounted that he saw Fields "[s]hoot down the street… [t]owards the crowd." During the interview, Waddell viewed two separate picture arrays in which he independently identified "Coco" as Appellant and "Edward" as Edwin Boyd.

Two years after his interview with police, Waddell was called to testify in Appellant's first trial in 2005. At trial, Waddell testified that he was not present for the shooting on May 28, 2003. Further, Waddell claimed that he was high on cocaine when he was arrested in July of 2003 and interviewed by the detectives. Waddell asserted that he had no memory of the interview and that it was not uncommon for him to periodically lose his memory. While disclaiming any memory of the interview during his trial testimony, Waddell opined that "nine times out of ten, you can make things happen if you cooperate with the police." He went on to claim that, when he was a regular drug user, he would have done anything to get out of jail so he could continue using.

Faced with Waddell's professed lack of memory, the court in Appellant's first trial

7

(2005) allowed the State to play his recorded interview from July 3, 2003. Following Appellant's first trial, Waddell died. Thus, over objection, the video of Waddell's testimony in Appellant's first trial – including his recorded interview from 2003 – was admitted in the present case.

Three months after his 2005 testimony, Waddell pled guilty to possession of a controlled dangerous substance with intent to distribute. Accordingly, in the trial *sub judice*, Appellant sought to impeach Waddell's 2005 testimony with evidence of his subsequent conviction. However, because Waddell was deceased and his subsequent conviction could not be raised through cross examination, Appellant asked the Circuit Court to take judicial notice of Waddell's subsequent conviction. The Circuit Court denied Appellant's request, and subsequently denied Appellant's motion for reconsideration on the same issue. On appeal, Appellant challenges the Circuit Court's refusal to take judicial notice of Waddell's prior conviction.

### c) *Jermaine Lee*

Jermaine Lee testified in both the present trial and Appellant's first trial in 2005. Lee was arrested along with Waddell and Broderick Campbell on July 2, 2003 and was charged with handgun and drug-trafficking offenses.

In the present trial, Lee testified that Campbell and Waddell were his friends, and that Bowens and the Courts brothers were his cousins. According to Lee they all sold drugs together in the area of Lafayette and Port and had matching tattoos. Lee disagreed with a portion of Horsey's testimony regarding the 2003 Teamsters Hall incident. Lee asserted that David Courts had claimed responsibility for the Teamsters Hall shooting; whereas

8

Horsey testified that he believed William Courts was responsible for the shooting. Lee recalled that after the Teamsters Hall shooting there was a "beef" with Horsey's "crew," and Horsey "put bounties" on the men from Lafayette and Port.

Lee testified that he was with "Buck" (Bowens) and William Courts on Port Street on the day of the Incident. Lee recalled it was a "[n]ormal day" until a car quickly came around the corner. According to Lee, Bowens told them it was nothing to worry about because he recognized the car as belonging to "Pooh" (Fields), who had previously sold them "E pills." Lee testified that Bowens then walked up to the car "with his hand in his dip," the car stopped, and the passenger door opened. Lee recalled that Appellant exited the car and shot Bowens in the chest, and subsequently shot William Courts. Lee stated that all four car doors opened, followed by the sound of multiple gunshots.

Lee testified that he did not initially speak with police because he "wanted revenge," meaning he "wanted to shoot [the perpetrators] back for shooting us." However, three weeks after Lee's arrest – along with Waddell and Campbell – Lee contacted a detective and volunteered to give information about the shooting. When speaking with police, Lee identified Appellant from a photo array as the person who shot James Bowens and William Courts.

### d) Edwin Boyd

Edwin Boyd participated in a recorded interview with police on June 13, 2003. Boyd was killed on July 9, 2003. Accordingly, Boyd's interview with police was admitted in the present trial.

In his interview with police, Boyd recalled that on the day of the Incident he was

9

with Appellant, Fields, and another individual. Fields drove them to Lafayette and Port in search of information from individuals in the area. Boyd stated that when they arrived in the area, they stopped and exited the car to speak with William Courts and James Bowens. Boyd then crossed the street to talk to his friend Broderick Campbell. Boyd recalled that he heard gunshots, after which Campbell pulled out a gun and tried to shoot him. Boyd pushed Campbell away and ran. Boyd heard more gunshots and was struck in the eye by a bullet as he fled.

Boyd stated that he did not see who was shooting. Boyd claimed that he had a gun in his pocket, which he threw in a sewer after fleeing. Further, Boyd denied having used his gun during the Incident notwithstanding Waddell's testimony that Boyd was one of the shooters. Police searched for the gun Boyd allegedly dropped in the sewer, but police could not find the weapon. Despite Boyd's claim that he did not fire a weapon, Boyd's hands tested positive for gunshot residue.

### e) Broderick Campbell

On July 3, 2003, Detectives interviewed Campbell, who was arrested with Waddell and who also asked to speak to the detectives. Detectives interviewed Campbell again on July 7 and conducted a photo array. Campbell was not called to testify at Appellant's fifth trial. However, Det. Snead, who led the investigation in this case, was permitted to testify, over objections, to the circumstances surrounding Campbell's second interview. According to Snead, Campbell was brought back for a second interview because he "re-contacted [the detectives] and said that there was more information that he wanted to give that he didn't give . . . the first time." On cross examination, Snead testified that Campbell

10

told the detectives that he had lied during the first interview because he was scared.

On redirect examination, over objection, Snead testified that during the July 3 interview, Campbell told detectives that he was present during the Incident, "but [Campbell] didn't make any observations." Additionally, Snead testified, over objection, that during the July 7 interview, Campbell told detectives: that the shooting involved a "Silver Crown Vic with a burgundy ragtop and tinted windows"; that Appellant and Fields were occupants of that vehicle; that he witnessed the shooting; that four people were involved in the shooting; and that those people used semi-automatic guns.

## DISCUSSION

On appeal, Appellant asserts six distinct legal challenges to the trial court's handling of the proceeding below. First, Appellant contends that the trial court erred by refusing to take judicial notice of Waddell's prior conviction, thus depriving Appellant of the opportunity to impeach Waddell's hearsay declarations. Second, Appellant contends that the trial court abused its discretion by allowing witnesses to testify to their knowledge of Appellant's involvement in two additional murders. Third, Appellant argues that the trial court erred in allowing the jury to view videos of Waddell and Horsey's prior testimony – as opposed to transcripts or audio recordings – because the videos revealed that Appellant was a defendant in two prior jury trials. Fourth, Appellant contends that the trial court erred in allowing Officer Snead to testify about statements Broderick Campbell made to Snead during a police interview. Fifth, Appellant asserts that the trial court abused its discretion by allowing the State to make impermissible statements in its closing argument and rebuttal. Finally, Appellant contends that the trial court erred when it declined to

11

propound Appellant's proposed voir dire question asking whether prospective jurors had any strong feelings about illegal drugs.

## I.  Refusal to take judicial notice of Waddell's prior conviction

### A. Parties' Contentions

In Appellant's first issue raised on appeal, Appellant contends that the trial court erred in refusing to take judicial notice of Waddell's[5] prior conviction.  Appellant argues that judicial notice of Waddell's prior conviction was necessary because Waddell's statements were hearsay and Waddell was not subject to cross examination. Thus, Appellant contends that judicial notice of Waddell's prior conviction was the only available method to impeach Waddell's credibility because it was the only way to have Waddell's prior conviction admitted into evidence. Appellant acknowledges that a trial court has discretion to exclude evidence of prior convictions for impeachment purposes.  However, Appellant argues that the trial court's failure to engage in a balancing test on the record was an abuse of discretion.  Appellant contends that Waddell's prior conviction was highly probative "because Waddell's credibility was central to the State's case." Appellant notes that Waddell's charges of possession with intent to distribute were pending when he gave his 2005 testimony.  Thus, Appellant argues that those pending charges, which led to conviction three months after Waddell's relevant testimony, "made it even less likely that he was telling the truth when he spoke to the detectives in 2003, and therefore, less likely that Appellant had actually been one of the shooters." Moreover, Appellant contends that

---

[5]    *See* Qonta Waddell factual background s*upra* at 7-9.

12

"the potential for prejudice to the State was nonexistent" because evidence of a State witness's prior conviction does not carry the same prejudicial risk of evidence of a defendant's prior convictions. Finally, Appellant asserts that the court's error in precluding the record of Waddell's conviction was not harmless given that his credibility was central to the State's case.

In response, the State contends that Appellant "never asked the [trial court] to allow him to impeach Waddell." Instead, the State asserts that Appellant "argued that the court should not allow Waddell's prior testimony to be played for the jury because there was no . . . opportunity to ask Waddell if he expected a benefit from testifying at [Appellant's] 2005 trial." The State admits that Appellant ultimately asked for the trial court to take judicial notice of Waddell's conviction. However, the State contends that Appellant only did so after an effort to exclude the testimony on the grounds that impeachment was impossible, and that when Appellant subsequently requested judicial notice it was not explicitly requested for impeachment purposes. Further, the State notes that Appellant had other available methods of entering Waddell's prior conviction into evidence, which Appellant did not attempt.[6] Finally, the State contends that, even if Appellant's judicial

---

[6]     The State noted that Appellant could have admitted Waddell's prior conviction for impeachment purposes

> by asking the State to stipulate to the conviction and argu[ing] to the jury that it should consider Waddell's 2005 prior testimony not credible because he had a motive to curry the State's favor. Had the State not agreed, [Appellant] could have asked Massey about Waddell's prior convictions because Massey was the arresting officer on one or more of Waddell's prior charges.

13

notice requests were implicitly meant to be considered for impeachment purposes, admitting Waddell's prior convictions would have risked confusion of the jury. Namely, the State argues that "asking the court to advise the jury that Waddell had been previously convicted of a list of offenses. . . . [a]bsent any context or instruction, the jury might have been confused as to why it was being asked to consider Waddell's convictions."

## B. Standard of Review

"The admissibility of evidence ordinarily is left to the sound discretion of the trial court." *Moreland v. State*, 207 Md. App. 563, 568 (2012) (citing Md. Rule 5–104(a); *State v. Simms*, 420 Md. 705, 724–25 (2011); *Myer v. State*, 403 Md. 463, 476 (2008); and *Hendrix v. Burns*, 205 Md. App. 1, 29 (2012)). Likewise, our review of a trial court's application of Rule 5–609 is deferential. *King v. State*, 407 Md. 682, 696 (2009) (citing *Jackson v. State*, 340 Md. 705, 719 (1995)). Accordingly, we review a trial court's Rule 5–609 evidentiary decisions under an abuse of discretion standard, "reversing only when the court exercise[d] discretion in an arbitrary or capricious manner or . . . act[ed] beyond the letter or reason of the law." *Id.* (internal quotation marks omitted) (quoting *Kelly v. State*, 392 Md. 511, 530-31 (2006)). Moreover, our decision as to whether a trial court abused its discretion "usually depends on the particular facts of the case [and] the context in which the discretion was exercised." *Id.* (quoting *Myer*, 403 Md. at 486).

## C. Analysis

On January 28, 2019, when addressing the admissibility of Waddell's 2005 testimony for the present trial, Appellant argued:

14

So in addition to the fact that Mr. Waddell wasn't able to be cross-examined on the impeachables . . . as they relate to this case, he also wasn't able to be examined as far as having accepted responsibility and having bias or motive to testify in a certain fashion.

. . . .

The Defendant did not have an adequate opportunity to cross examine the witness . . . . And we would put that same information here because we didn't have an opportunity to cross examine Mr. Waddell on the convictions because they didn't exist at the time . . . . And also we didn't get to cross examine about the relationship with Detective Massey the other cases and of the misconduct with Detective Massey. . . .

. . . .

. . . And under 5-806, . . . "If the State purports that it would come under 802.1 even though the witness isn't present at this hearing for testimony, when a hearsay statement has been in evidence, the credibility of the Declarant may be attacked and if attacked, may be supported by any evidence which would be admissible for those purposes if the Declarant has testified as a witness."

So not only is he unavailable and not previously subject to cross, but under 5-806 we'd be able to impeach him as if he were present and I can't do that without him being present.

And 802.1 just wholly doesn't apply because he's not there.

Thus, Appellant initially sought to exclude Waddell's prior testimony altogether. However, the court denied Appellant's motion to exclude Waddell's prior testimony.

Thereafter, in the following exchange, Appellant requested that the trial court take judicial notice of Waddell's prior conviction:

**[APPELLANT'S COUNSEL]:** Your Honor, would the Court take judicial

15

notice of the impeachable (indiscernible at 2:18:45).[7]

**THE COURT:** What's your position, Counsel?

**[THE STATE]:** I don't believe that that's admissible.

**THE COURT:** I'm going to deny your request, Counsel.

Subsequently, on February 1, 2019, Appellant asked if the court had reconsidered his request to judicially notice Waddell's prior conviction in the following brief exchange:

> **[APPELLANT'S COUNSEL]:** Your Honor, I had previously asked the Court to take judicial notice of Qonta Waddell's convictions. I just had put all of those true tests into the record that would have been invisible had he not passed away and I just wanted to ask the Court if there was any reconsideration on that.
>
> **THE COURT:** No.
>
> **[APPELLANT'S COUNSEL]:** Okay.
>
> **THE COURT:** Thank you.

Contrary to the State's contention that Appellant did not preserve the issue of admissibility of Waddell's impeachable conviction, Appellant sufficiently preserved the issue for review by raising the issue and subsequently renewing the request. *See* Rule 4-323(c) (To preserve an objection to a ruling or order it "is sufficient that a party, at the time the ruling or order is made or sought, makes known to the court the action that the party desires the court to take or the objection to the action of the court."). Accordingly, we proceed to determine whether the trial court abused its discretion in declining to admit Waddell's impeachable conviction.

---

[7]     Given the context of the statement, we assume that the indiscernible portion of the statement was intended to be "prior conviction" or something to that effect.

16

Under Md. Rule 5-806(a), "[w]hen a hearsay statement has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if the declarant had testified as a witness." That Waddell's statement was hearsay is not in dispute. Accordingly, Appellant was permitted to attack Waddell's credibility as though Waddell were present for cross examination. Md. Rule 5-609 provides the rule for admissibility of a witness's prior convictions:

> **(a) Generally.** For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or the objecting party.
>
> **Committee note:** The requirement that the conviction, when offered for purposes of impeachment, be brought out during examination of the witness is for the protection of the witness. It does not apply to impeachment by evidence of prior conviction of a hearsay declarant who does not testify.

In this case, the committee note provides salient guidance on the applicability of Rule 5-609 to Waddell's prior conviction. It is undisputed that Waddell's prior conviction was a *per se* impeachable offense. Further, it appears that the trial court agreed with the State's incorrect assertion that the evidence was not admissible. Moreover, Appellant had not raised the issue in any prior motion for the court's consideration. Accordingly, the trial court ostensibly failed to engage in the appropriate balancing test to determine whether the prejudice of admitting the conviction outweighed the probative value. In failing to engage in the appropriate balancing test for admission of the impeachable conviction, the trial court

17

abused its discretion. *See Beales v. State*, 329 Md. 263, 270 (1993) (Holding that trial courts are required to make a "preliminary determination of probativeness and potentially unfair prejudice for *all* convictions used to impeach credibility."). Regardless, we hold that the error in refusing to admit Waddell's prior conviction was harmless. We explain.

Prior cases have held that non-admission of impeachment evidence is less of a concern when a jury already has sufficient additional grounds to question a witness' credibility. *See U.S. v. Nelson*, 39 F.3d 705, 708 (7th Cir. 1994) (Holding that any error in limiting the defense's opportunity to cross examine a witness was harmless where such limitation "did not deny the defendants the opportunity to *establish* that the witnesses may have had a motive to lie; rather, the limitations denied them the opportunity to add extra detail to that motive."); *U.S. v. Mullah*, 503 F.2d 971, 977 (2nd Cir. 1974) (Holding that trial court did not err in limiting cross examination of State witness where the jury already had "sufficient evidence concerning [witness's] credibility to make a discriminating appraisal of him."); *Cf. Conyers v. State*, 354 Md. 132 (1999) (Explaining that any error in allowing State to impeach defense witness with prior convictions was harmless where jury was well aware of witness' incarceration.). In the case *sub judice*, the jury had ample reason to question Waddell's credibility. The jury viewed a recording of Waddell's prior testimony. In that recording Waddell claimed that he was high on cocaine when he was arrested in July of 2003 and interviewed by the detectives – the interview in which he provided testimony incriminating Appellant. Waddell later recanted that same testimony. Further, Waddell asserted that he had no memory of the interview and that it was not uncommon for him to periodically lose his memory. Waddell added that "nine times out

18

of ten, you can make things happen if you cooperate with the police." Finally, Waddell stated that when he was a regular drug user, he would have done anything to get out of jail so he could continue using. We find it difficult to fathom that Waddell's prior drug related conviction would sway any juror who, after hearing Waddell's own statements of his rampant drug use, lack of credibility, lack of reliability, and motive to lie, found Waddell's testimony credible. Thus, we hold that any error in failing to admit Waddell's prior impeachable conviction was harmless beyond a reasonable doubt.

In reaching our holding we are mindful of the Court of Appeals decision in *Dionas v. State*, 436 Md. 97 (2013). In *Dionas*, the Court of Appeals stated that "where credibility is an issue and, thus, the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a witness' credibility is not harmless error." 436 Md. at 110 (*citing Martin v. State*, 364 Md. 692 (2001); *Howard v. State*, 324 Md. 505 (1991); *and State v. Cox*, 298 Md. 173 (1983)). However, our holding in this case does not depart from the reasoning in *Dionas*. Here, while credibility of the State's witnesses was certainly an important issue, non-admission of Waddell's prior conviction did not deprive the jury of the necessary information to thoroughly assess Waddell's credibility. The jury was aware of Waddell's involvement with drugs, as well as his professed lack of credibility and motive to lie. Conversely, in *Dionas*, the Court of Appeals found that an error was not harmless where the trial court precluded cross-examination of a witness regarding his potential bias, a potential bias which the jury did not have the ability to detect through additional impeachment evidence. The cases cited by *Dionas* for the above language are similarly distinct. *See Martin*, 364 Md. 692 (Holding error of limiting cross examination

19

of witness's potential bias was not harmless where the jury heard no other impeachment evidence implicating witness's potential bias.); *Howard*, 324 Md. 505 (Holding error of erroneously admitting evidence of criminal defendant's prior conviction was not harmless where defendant testified to a different version of events than the State presented, and case largely turned on whom the jury was going to believe.); *Cox*, 298 Md. 173 (Holding error of precluding defense from cross-examining victim, concerning a matter relating to credibility, was not harmless where the jury heard no other evidence which undermined victim's credibility.).

Additionally, *Dionas* states that our harmless error analysis should focus on the error's impact on the jury. *See Dionas*, 436 Md. at 110-11 ("In criminal jury cases where error has been established, we have considered a number of factors that may have influenced the jury's perspective as the arbiters of fact. One such factor is the nature, and the effect, of the purported error upon the jury . . . [w]e have also considered the jury's behavior during deliberations as a relevant factor in the harmless error analysis."). As previously explained, the impact of the exclusion of Waddell's prior conviction on the jury would be virtually nil considering Waddell's professed rampant drug use, lack of credibility, lack of reliability, and motive to lie. Moreover, notes from the jury during relatively short deliberations, as well as the split verdict, indicate that the jury did not trust Waddell's version of events. Waddell testified that Appellant shot William Courts *and* James Bowens. However, the jury acquitted Appellant of the second-degree murder of James Bowens; but convicted Appellant of attempted murder and conspiracy to murder William Courts – a conviction supported by the testimony of numerous additional

20

witnesses. Before reaching its verdict, the jury sent a note which elucidated this point: "Based on the law, if we find [Appellant] guilty of attempted murder of William Courts, does that mean we must find [Appellant] guilty of killing James Bowens?" This note, along with the jury's split verdict, indicates that at the very least, the jury did not rely on a portion of Waddell's testimony. Accordingly, because the jury had ample ability to fully assess Waddell's credibility without admission of his prior conviction and given that the record indicates that the jury did not rely on Waddell's testimony, we hold that any error was harmless beyond a reasonable doubt.

Before proceeding to Appellant's additional contentions, it is important to add that Appellant had other potential means of introducing Waddell's prior conviction which Appellant did not pursue. In *Taylor v. State*, the Court of Appeals noted alternative means of impeaching an unavailable witness:

> [T]he unavailability of the declarant will not always foreclose using prior misconduct as an impeachment tool because the witness testifying to the hearsay statement may be questioned about the declarant's misconduct—without reference to extrinsic evidence thereof—on cross-examination concerning knowledge of the declarant's character for truthfulness or untruthfulness.

*Taylor v. State*, 407 Md. 137, 163-64 (2009) (Quoting *United States v. Saada*, 212 F.3d 210, 221 (3rd Cir. 2000)). In the present case, Appellant could have asked about Waddell's prior conviction during cross-examination of Det. Snead. The fact that Appellant did not attempt to elicit Waddell's prior conviction from Det. Snead is yet another indication that the value of establishing Waddell's prior conviction was negligible considering Waddell's own statements of unreliability.

## II. *Admission of statements implicating Appellant's involvement in additional murders.*

Appellant contends that the trial court abused its discretion by allowing testimony which implicated Appellant's involvement in two other murders. Specifically, testimony from Eric Horsey,[8] which alleged Appellant's involvement in the murders of Edwin Boyd and David Courts; and testimony from Detectives Massey and Snead, which according to Appellant, corroborated Horsey's testimony relating to Appellant's involvement in the murders of Edwin Boyd[9] and David Courts. Appellant objected to the testimony at issue, and thus, the issue of admissibility of that evidence is properly before us on appeal. Before addressing Appellant's specific contentions on this issue, a factual account of the testimony is helpful.

### *Horsey's testimony*

In a 2007 written statement, Horsey identified Appellant in a photo array. In that statement, Horsey wrote: "This is Coco. I, Eric Horsey, paid him $10,000 for a murder he committed for me. The name of the victim is David Courts."

In his 2010 testimony, Horsey stated that Appellant contacted him two days after the Incident to tell Horsey that he had just killed David Courts. Further, Appellant told Horsey that he was with "Bee" (Brian Smith) when "the Port Street guys" drove by in a Crown Victoria. Appellant and Bee then drove beside the Crown Victoria, and Bee shot David Courts. Horsey also confirmed in his 2010 testimony that he paid Appellant $10,000

---

[8]     *See* Eric Horsey factual background *supra* at 5-7.

[9]     *See* Edwin Boyd factual background *supra* at 10-11.

22

for the murder of David Courts, which Appellant divided amongst himself, Bee, and Boyd.

In the same 2010 testimony, Horsey further testified that when Appellant was arrested, Appellant initiated a three-way call with Horsey and Bee. During that call, Appellant relayed the charges against himself and Darnell Fields, and said that Boyd had already talked to the State. Moreover, Horsey testified that, during that same call, Appellant told Horsey that they "had to get rid of" Boyd. Horsey understood this as a request to kill Boyd. Horsey testified that he assured Appellant that he "was going to take care of it," but that he later told Bee that he would not kill Boyd because Boyd was a juvenile. However, Horsey testified that Bee said that he would kill Boyd because "it was either [Boyd's] life or [Appellant's] freedom." Within a week, Bee informed Horsey that he "had some girl lure him out of the house and had another dude kill him."

### *Detectives' Testimony*

During Massey's and Snead's direct examinations, the detectives explained that David Courts was killed on May 30, 2003, on the 900 block of North Collington Ave., and that his murder involved a Crown Victoria. The detectives also testified that Boyd died on the same day that Appellant was arrested, just two hours after Appellant had told Det. Massey he was going to "beat these bodies."

### A. Parties' Contentions

Appellant contends that the trial court abused its discretion by allowing the testimony from the detectives and Horsey which implicated Appellant's involvement in the murders of Edwin Boyd and David Courts. In support of this contention, Appellant makes two alternative arguments. First, Appellant argues that the trial court erred by failing to

23

apply – on the record – the three-step analysis for admission of other crimes evidence. Appellant notes that a trial court's exercise of discretion must be clearly evinced from the record; and argues that the record does not reflect that the trial court properly exercised its discretion. Second, Appellant argues that, assuming *arguendo* that the trial court did apply the three-step analysis *sub silentio*, the trial court nevertheless erred in admitting the evidence. Specifically, Appellant contends that "there was not clear and convincing evidence that Appellant was involved in these other crimes," as required by the second prong under the special relevance test for admission of other crimes evidence. Moreover, Appellant contends that the evidence implicating Appellant's involvement in the two murders was "substantially more prejudicial than probative."

In response, the State contends that the trial court properly exercised its discretion when it allowed testimony implicating Appellant's involvement in the two additional murders. The State argues that the testimony implicating Appellant's involvement in Boyd's murder was properly admitted as consciousness of guilt evidence. Moreover, the State argues that "[e]vidence of [Appellant's] involvement in David Courts's murder was relevant to show [Appellant's] motive for shooting William Courts." Further, the State contends that there was clear and convincing evidence of Appellant's involvement in both murders. Specifically, the State notes that Horsey's testimony – that Appellant told Horsey that they "had to get rid of Boyd"; that Horsey refused to pay Appellant for William Courts's *attempted* murder; and that Horsey later paid Appellant for David Courts's murder – was competent evidence of Appellant's involvement in both murders. Finally, the State challenges Appellant's assertion that the trial court should have explained its reasoning for

24

admitting the evidence on the record. The State argues that the record reflects that the trial court properly exercised its discretion where the trial court, "after review of [Appellant's] motion" on the issue, denied Appellant's challenge to admission of the evidence.

## B. Standard of Review

While evidence of a defendant's past crimes or wrongful acts is generally inadmissible, such evidence may be admitted where that "'evidence is substantially relevant to some contested issue in the case and is not offered to prove guilt based on propensity to commit crimes.'" *Vaise v. State*, 246 Md. App. 188, 207 (2020), *cert. denied*, 471 Md. 86 (2020) (quoting *Darling v. State*, 232 Md. App. 430, 462 (2017)).

> In *Vaise*, we reiterated the three-part test for admission of other crimes evidence:
>
> First, the court must determine whether the evidence fits into one or more of the exceptions in Rule 5-404(b). This is a legal determination. Second, it must be shown by clear and convincing evidence that the defendant engaged in the alleged criminal acts. In this regard, we review the trial court's decision to determine if there is sufficient evidence to support its finding. Third, the court must find that the probative value of the evidence outweighs any unfair prejudice. This determination involves the exercise of discretion by the trial court.

246 Md. App. at 207–08 (internal quotation marks and brackets omitted) (quoting *Darling*, 232 Md. App. at 462–63 (quoting from *Hurst v. State*, 400 Md. 397, 406 (2007); *Sifrit v. State*, 383 Md. 116, 133 (2004); and *State v. Faulkner*, 314 Md. 630, 634 (1989))).

## C. Analysis

As an initial matter, we address Appellant's contention that the trial court failed to demonstrate, on the record, that it exercised its discretion in denying Appellant's motion to exclude the relevant portions of Horsey's testimony. Notably, when applying Rule 5-

404(b), a trial court exercises discretion while weighing the probative value of the evidence against its prejudicial effect. We review the special relevance of the evidence *de novo*, and the sufficiency of the evidence to support that finding for clear error. *See Oesby v. State*, 142 Md. App. 144, 158-59 (2002) ("Before evidence of 'other crimes' may be admitted against a defendant, a three-step analysis must be undertaken by the trial judge. The first determination is an exclusively legal one, with respect to which the trial judge will be found to have been either right or wrong."); *and see State v. Faulkner*, 314 Md. 630, 635 (1994) ("If one or more of the exceptions applies, the next step is to decide whether the accused's involvement in the other crimes is established by clear and convincing evidence.").

Appellant cites *Streater v. State*, for the contention that when a trial court applies Rule 5-404(b) "it *should* state its reasons for doing so in the record." 352 Md. 800, 810 (1999) (emphasis added). However, Appellant's reliance on *Streater* is unavailing. In *Streater*, the relevant issue involved a trial court's admission of a protective order into evidence. *Id*. That order contained factual findings by a district court judge, in which the district court judge found that the defendant had committed prior crimes. However, those prior crimes were unrelated to the crimes the defendant was charged with in *Streater*. The defense counsel objected to the inclusion of the full document because the prosecution only offered the document to show that a protective order had been issued. Moreover, defense counsel argued that the inclusion of the district court judge's factual findings was unduly prejudicial and not offered for any special relevance, given that the prosecution only sought to show that the protective order had, in fact, been issued. However, the trial court admitted the document as evidence of the prosecution's case in chief, without any indication that it

26

had considered – or was aware of – the factual allegations of other crimes contained within the protective order. Thus, the Court of Appeals held that the record did not demonstrate that the trial court "carefully assessed the admissibility of the factual findings of other crimes contained within the protective order." In fact, the Court of Appeals noted that "[n]either the judge, the defense attorney, nor the prosecutor ever specifically mentioned any of the three bad acts contained in the protective order[]" at any point on the record. *Id.* at note 5.

Unlike in *Streater*, in the case *sub judice*, the trial court was keenly aware of Appellant's prior acts implicated in Horsey's testimony – i.e. murders of Edwin Boyd and David Courts. The trial court allowed admission of those portions of Horsey's testimony which implicated Appellant in the additional murders "after review of [Appellant's] motion" on that precise issue. We have previously stated that there is a "strong presumption that judges properly perform their duties." *Darling v. State*, 232 Md. App. 430 (quoting *Jones v. State*, 178 Md. App. 123, 144 (2008)). For that reason, "[t]he fact that the record does not reflect whether a trial court conducted [a Rule 5-404] balancing test does not mean the court did not do so." *Id.*; see also *Ridgeway v. State*, 140 Md. App. 49, 69 (2001) ("It is of no consequence . . . that the trial court did not articulate its reasoning on the record. In weighing the probative value of other crimes evidence against the prejudicial effects of such evidence, a trial court is not required to spell out in words every thought and step of logic in weighing its considerations."). There is nothing in the record to rebut the presumption that the trial court fully considered Appellant's motion under the three-part test for admission of other crimes evidence.

27

To support the presumption, the record indicates that the trial court fully considered Appellant's motion under the three-part test for admission of other crimes evidence. As to the special relevance prong, the trial court's closing instructions demonstrate that the court admitted the "additional murders" testimony because it had special relevance:

> You have heard evidence about the murder of David Courts, the murder of Edwin Boyd, . . . . You may consider this evidence only on the question of identity, common scheme or plan, preparation, motive, intent, opportunity, knowledge . . . . [Y]ou may not consider this evidence for any other purpose. Specifically, you may not consider it as evidence that the Defendant is of bad character or has a tendency to commit crime.

Accordingly, the trial court did not abuse its discretion by failing to articulate its specific reasoning for denying Appellant's motion because the record demonstrates that the trial court fully considered the issues presented. Thus, we turn to the question of whether the trial court was legally correct in finding that the hearsay was admissible under a special relevance category.

Maryland Rule 5-404(b) provides the rule for admissibility of evidence of a defendant's other crimes, wrongs, or acts:

> **(b) Other Crimes, Wrongs, or Acts.** Evidence of other crimes, wrongs, or other acts including delinquent acts as defined by Code, Courts Article § 3-8A-01 is not admissible to prove the character of a person in order to show action in the conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, absence of mistake or accident, or in conformity with Rule 5-413.

Md. Rule 5-404(b). In this case, evidence of Appellant's involvement in the murder of David Courts was relevant to show Appellant's motive for the attempted murder of William Courts. Namely, the testimony showed that Appellant's attempt to murder William Courts

28

was motivated by his desire to collect the bounty issued by Horsey against the Courts brothers. Horsey's testimony established that Appellant had received payment under the same bounty. Appellant was not paid after claiming to have killed William Courts because William Courts survived; however, Appellant *was* paid after telling Horsey that he "got rid" of David Courts and Horsey verified that David Courts was deceased. Thus, Appellant's receipt of the bounty from Horsey for David Courts's murder established Appellant's motive for killing William Courts – to collect the bounty Horsey had placed on the Courts brothers.

Moreover, the testimony of Appellant's involvement in Edwin Boyd's murder was relevant to establish Appellant's consciousness of guilt for the murder of William Courts. *See Conyers v. State*, 345 Md. 525, 554 (1997) (Noting that "consciousness of guilt is an 'other purpose' that will overcome the presumption of exclusion that is attached to 'other crimes' evidence"; and stating that evidence indicating a murder defendant's involvement in the murder of a witness would be admissible as consciousness of guilt evidence). Thus, we turn to determine whether there was clear and convincing evidence of Appellant's statements to Horsey, indicating his involvement in the murders of David Courts and Edwin Boyd. We hold that there was. We explain.

In *Page v. State*, we explained our review of a trial court's finding of clear and convincing evidence as follows:

> Clear and convincing evidence means that the witness to a fact must be found to be credible, and that the facts to which he has testified are distinctly remembered and the details thereof narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. This Court has explained, however,

29

it self-evidently is the trial judge who must be thus persuaded clearly and convincingly that the prior act occurred, and on appellate review, this Court does not determine whether we would be persuaded that the act occurred, but only the *legal question* of *whether there was some competent evidence which, if believed, could persuade the fact finder as to the existence of the fact in issue*. Therefore, we must determine whether the evidence was sufficient to support the trial judge's finding.

222 Md. App. 648, 665 (2015) (Internal quotation marks, ellipses, and citations omitted) (Emphasis added). Thus, our review focuses on whether the State met its burden of production. The trial court was in the best position to assess the credibility of witnesses and was persuaded that Appellant did in fact make those statements to Horsey about Boyd and David Courts. Horsey had direct personal knowledge of Appellant's statements pertaining to Boyd and David Courts. Horsey's testimony was certainly "some competent evidence which, if believed, could persuade the fact finder as to the existence of the fact in issue." *Id*. Whether this court is convinced by Horsey's testimony is irrelevant. *Cf. Oesby*, 142 Md. App. at 165 (At clear and convincing step of 5-404 analysis "[t]he only appellate concern is whether there was some basis from which a rational fact-finding trial judge could have concluded that the "other crimes," in fact, took place.).

As to the corroborative statements made by Detectives Snead and Massey, those statements were similarly based on their personal knowledge, and did not implicate Appellant in any crime or other wrongful act. Only when the detectives' statements are viewed together with Horsey's testimony do they tend to implicate Appellant's involvement in either murder. The detectives' testimony enhanced the credibility of Horsey's testimony, which Appellant had attacked, and would be specially relevant for the same purposes as Horsey's testimony.

30

Finally, while the evidence tending to implicate Appellant's involvement in the additional murders certainly carried prejudice, the evidence was highly probative of Appellant's motive and consciousness of guilt for the crimes alleged. The trial court was in the best position to assess the prejudicial impact of the testimony and we see no basis to disturb the trial court's determination on appeal. Accordingly, we hold that the trial judge did not abuse its discretion in allowing Horsey's testimony, or the detectives' corroborative testimony, which implicated Appellant's involvement in the murders of Boyd and David Courts.

### III. Allowing jury to view video footage of Horsey and Waddell's prior testimony which revealed that Appellant had a prior jury trial.

During a preliminary hearing before Appellant's fifth trial, Appellant requested that any prior testimony offered by the State be offered in audio format and argued that the State should not allow any witnesses to reveal that Appellant had been previously tried.

Regarding Horsey's testimony, Appellant objected to the prejudicial nature of the video and requested redactions of the phrase "ladies and gentlemen of the jury." The court denied Appellant's general objection to the admission of Horsey's testimony. As to Appellant's request to redact the phrase "ladies and gentlemen of the jury," the State noted that Waddell's prior testimony made similar references and had been twice admitted in prior trials. Further, the State argued that under Maryland law it is considered unduly prejudicial to allow references to a prior conviction, whereas references to a prior trial are considered significantly less prejudicial. After hearing both positions, the trial court denied Appellant's request to redact the phrase "ladies and gentlemen of the jury" from Horsey's

31

testimony. The phrase appeared six times in Horsey's recorded testimony. While Waddell's testimony also indicated that Appellant had a previous jury trial, Appellant lodged only a general objection to the admission of Waddell's testimony, without requesting redaction of specific portions that indicated that Appellant had a prior jury trial.

## A. Parties' Contentions

Appellant contends that the Circuit Court erred when it allowed the jury to view portions of video recordings – of Horsey's 2010 testimony and Waddell's 2005 testimony – which revealed that Appellant was a defendant in two prior jury trials. Appellant asserts that "if the State seeks to introduce evidence that conveys to the jury that a defendant has been previously tried and potentially convicted, the court must—at the very least—engage in a balancing of probative value and prejudice based on the unique circumstances of the case. (*Citing* MD Rule 5-403). However, Appellant asserts that the Circuit Court "made no record of engaging in such an analysis" and argues that the Circuit Court abused its discretion by "failing to engage in a balancing of the probative value versus the unfair prejudice . . . ." Alternatively, Appellant argues that, even if the record is sufficient to show that the Circuit Court exercised discretion, the Circuit Court "abused its discretion in admitting the videos without making any effort to limit their prejudicial impact." Appellant contends that forecasting to the jury that Appellant had prior jury trials was prejudicial because "[t]he jury could easily have assumed that because the State had put more than a decade of time, money, and resources into multiple prosecutions, Appellant must in fact be guilty of at least some of the charges." Appellant urges that "[o]nce the court determined that the prior statements were admissible, it was tasked with ascertaining a means of

32

admission that would carry the least prejudice while not significantly impairing the probative value of the evidence." To mitigate the risk of prejudice, Appellant argues that the Circuit Court could have either "ordered the State to present the testimony in a transcript with all references to the 'jury' redacted[,]" or "could have limited the evidence to audio with the same redactions."

## B. Standard of Review

Generally, "a trial court's rulings on the admissibility of evidence are reviewed for abuse of discretion." *Gordon v. State*, 431 Md. 527, 533 (2013). A trial court does not have discretion to admit irrelevant evidence. *State v. Simms*, 420 Md. 705, 724-25 (2011) ("Maryland Rule 5–402 . . . makes it clear that the trial court does not have discretion to admit irrelevant evidence . . ."). However, "[w]hen the trial judge's ruling involves a weighing of both the probative value of a particular item of evidence, and of the danger of unfair prejudice that would result from the admission of that evidence, we apply the . . . abuse of discretion standard of review." *Ruffin Hotel Corp. of Maryland, Inc. v. Gasper*, 418 Md. 594, 620 (2011) (internal quotations and brackets omitted). Because Appellant contends that the trial court abused its discretion by "failing to ameliorate" the prejudicial content of otherwise relevant evidence, we review the trial court's action for abuse of discretion. A trial court abuses its discretion when its decision is "well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable." *Alexis v. State*, 437 Md. 457, 478 (2014) (*Quoting Gray v. State*, 388 Md. 366, 383 (2005)).

## C. Analysis

Appellant's counsel raised the issue of references to Appellant's prior trials and convictions during preliminary objections. The following exchange ensued:

[APPELLANT'S COUNSEL]: Oh, and the references to the prior trial. What -- that was the reason for the last mistrial.

THE COURT: Yes.

[APPELLANT'S COUNSEL]: I just want to get that out there and try to straighten that up. So if we could -- I wanted the State to instruct all of its witnesses to not reference trial, that this should be hearing, proceeding, certainly nothing about a verdict, certainly nothing about a co-defendant verdict.

THE COURT: Granted.

[APPELLANT'S COUNSEL]: Okay.

[THE STATE]: And I just want to clarify on that point because I agree with [Appellant's Counsel] and I've instructed my witnesses to refer to it as proceedings, not trials. But I want the Court to be aware of *Poole v. State* and *Coffey v. State*, and the citation is 295 Md. 167 and 100 Md. App. 587. Prejudice is not reference to prior trials. Prejudice is an insinuation that there has been a previous verdict. I say that, and I -- I'm not playing semantics here, because there are certain instances in this case where references to prior trials is inevitable but it's not that we're hounding that there was a previous trial.

THE COURT: When are you going to use that language instead of a [prior hearing]? . . . Is it a problem?

[THE STATE]: No. I'm going to call them prior hearings.

. . . .

[THE STATE]: But, for example, when we play the previous testimony of Qonta Waddell, I -- if there's a necessity for a limiting instruction or a curative instruction I don't want [Appellant's Counsel] to find herself jumping up and down if anything goes anywhere near a previous trial 'cause that's not the standard.

. . . .

34

THE COURT: Thank you. But before you put on your witnesses you will inform them[,] they are to use[] proceedings and prior hearings?

. . . .

**THE STATE:** . . . We'll have to catch it when it happens and just clarify, previous proceedings. But even if it's previous trial, that's not what triggers a mistrial.

**THE COURT:** Thank you, Counsel.

In *Belton v. State*, 152 Md. App. 623 (2003), we addressed a similar issue where a defense counsel objected to specific portions of a video recording. In that case, we explained that

> after the circuit court overruled appellant's general objection to admission of the tape, appellant did not request a redaction or limitation of the portion of the tape to be played to the jury. Appellant contended at oral argument that it was the State's obligation to limit or redact portions of the tape that exceeded Thomas's identification. This contention is without merit, for it is the obligation of the party seeking redaction to raise the issue to the judge.

*Id*. at 61. Here, as in *Belton*, it was Appellant's obligation to request redaction of specific portions of the recording, or to request that the recording be offered in audio or transcript format. Instead, the record reflects that, aside from cursory comments made prior to the video's introduction, Appellant did not request that the evidence be admitted only in audio or transcript format.[10] Likewise, Appellant's only specific redaction request was to redact,

---

[10]  During the exchange regarding references to prior trials, Appellant's Counsel opined:

> [S]o one of the things that I thought would not be a bad idea . . . the video of Qonta Waddell . . . the State can play the audio. Because you don't need to see [Appellant] sitting at the trial table with [his former co-defendant] and all these lawyers. It only hurts him.

35

from Horsey's testimony, the phrase "ladies and gentlemen of the jury." As in *Belton*, general objections will not suffice. Thus, our review will be limited to whether the trial court abused its discretion in declining to redact the phrase "ladies and gentlemen of the jury" from the video recording of Horsey's testimony offered by the State.

We decided a similar issue in *Brown v. State*, 153 Md. App. 544 (2003). In *Brown*, the trial court allowed the jury to view a video – over two hours long – of the defendant's prior testimony at his previous trial for the same offense. The defense argued that the video should not have been admitted because it revealed that the defendant had been previously tried for the same offense. We held that, although the video did reveal that the defendant had been previously tried for the same offense, admission of the recording was not an abuse of discretion because the jurors would not have known that the defendant had been previously *convicted*. In reaching our holding we stated that

> any juror who was awake during the course of the trial would have known that [the defendant] had been tried previously for the killing . . . . Jurors who served in the second trial, however, would not have known that [the defendant] previously had been convicted of any crime connected with [the] murder. This distinction is crucial[.]

*Id*. at 569-570. In the present case, as in *Brown*, jurors would not have known that Appellant had been previously convicted of the same offense. Instead, the inclusion of the phrase "ladies and gentlemen of the jury," would have revealed only that Appellant was previously tried for the same offense.

Appellant does not cite any case in which a reference to a prior trial, without

reference to a prior conviction, was held to be sufficient grounds for a new trial. Instead, Appellant cites *Coffey v. State*, 100 Md. App. 587 (1994), as an example of when "a defendant's right to a fair trial is irreparably impaired[.]" However, Appellant's reliance on *Coffey* is unavailing. In *Coffey*, we reversed a conviction because the jury heard trial testimony which revealed that the defendant had been previously tried *and convicted* for the same offense. Unlike *Coffey*, here, the testimony did not reveal that Appellant was previously convicted for the same offense.

We cannot say that the trial court abused its discretion in declining to redact the phrase "ladies and gentlemen of the jury" from Horsey's recorded testimony. While the inclusion of that phrase likely alerted the jury that Appellant was previously tried, it did not reveal whether that trial resulted in a conviction. In the case *sub judice*, the trial court ensured that live witnesses would not reference previous trials. Moreover, the trial court was not, as Appellant contends, "tasked with ascertaining a means of admission that would carry the least prejudice." Instead, Appellant was tasked with requesting specific redactions of portions that carried the risk of undue prejudice. Appellant's specific request, to redact the phrase "ladies and gentlemen of the jury" from Horsey's testimony, even if granted would not have prevented the jury from learning that Appellant had been previously tried. Accordingly, we hold that the trial court did not abuse its discretion in admitting the recorded testimony without redacting the phrase "ladies and gentlemen of the jury" from the recording.

## IV. *Testimony regarding Campbell's statements to detectives.*

Appellant's fourth contention on appeal relates to Broderick Campbell's statements

37

to police.[11]  Campbell gave two statements to police: (1) a statement on July 3, 2003, in which Campbell stated that he was present during the Incident, but didn't make any observations; and (2) a statement on July 7, 2003, in which Campbell told police that he did make observations, gave those observations to police, and stated that he hadn't been forthcoming with police in the July 3rd statement because he was scared.  In the present trial, Det. Snead testified about his interviews with Campbell.  On direct examination by the State, Det. Snead testified that he spoke with Campbell on July 3rd and that Campbell was shown a photo array.  Thereafter, during direct examination, the State asked Det. Snead why detectives brought Campbell in for a second interview:

> **[THE STATE]:**  Was Mr. Campbell brought back for a second interview?
>
> **[DET. SNEAD]:**  Yes, he was.
>
> **[THE STATE]:**  And was there -- without discussing the details of the conversation, was there a reason for a second interview with Mr. Campbell?
>
> **[DET. SNEAD]:**  Yeah. Mr. Campbell re-contacted us and said that there was more information that he wanted to give that he didn't give –
>
> **[APPELLANT'S COUNSEL]:**  Objection.
>
> **[DET. SNEAD]:**  -- the first time.
>
> **THE COURT:**  Overruled.
>
> **[DET. SNEAD]:**  He said that there was additional information that he wanted to give that he didn't give the first time.

Det. Snead did not provide any other testimony relating to Campbell's statements on direct examination.  However, on cross examination, Appellant's counsel asked Det. Snead about

---

[11]  *See* Broderick Campbell factual background s*upra* at 11-12.

Campbell's statements to police:

> **[APPELLANT'S COUNSEL]:** The State asked you why you brought him back and you characterized it as giving additional information, correct?
>
> **[DET. SNEAD]:** Yes.
>
> **[APPELLANT'S COUNSEL]:** You characterized it as he lied.
>
> **THE COURT:** Is that — what your characterization?
>
> **[DET. SNEAD]:** I don't believe I said that, I believe that —
>
> . . . .
>
> **[APPELLANT'S COUNSEL]:** Was that how you characterized it? Did you characterize Mr. Broderick Campbell coming back to you and saying on July 3rd, he lied?
>
> **[DET. SNEAD]:** I said that on July 3rd — what I wrote is basically saying what he said. He said that he lied to the investigators because he was scared.
>
> **[APPELLANT'S COUNSEL]:** And so you wrote in your report — and the information that you got between the 3rd and the information you got on the 7th was different, right?
>
> **[DET. SNEAD]:** I wouldn't say it was different, but there was supplement[al] information that he provided on the 7th.
>
> **[APPELLANT'S COUNSEL]:** Supplemental information that incriminated himself or incriminated other people?
>
> **[DET. SNEAD]:** He made an identification of Mr. Colkley.
>
> **[APPELLANT'S COUNSEL]:** He told you that he lied?
>
> **[DET. SNEAD]:** That was what he said. He said he lied because he was scared.

In response, on re-direct, the State followed up on the line of questioning initiated by

Appellant's trial counsel:

> **[THE STATE]:** At some point yesterday we were talking about Broderick Campbell.
>
> **[DET. SNEAD]:** Yes, sir.

. . . .

**[THE STATE]:** And I believe [defense counsel] stated to you that Broderick Campbell admitted to lying (indiscernible) classification?

**[DET. SNEAD]:** Yes, sir.

. . . .

**[THE STATE]:** . . . Mr. Campbell, the evening of July 3rd to speak about the events of May 28th, 2003, correct?

**[DET. SNEAD]:** Yes, sir.

**[THE STATE]:** And do you recall — you don't have to say word for word what he said but what was Mr. Campbell's explanation for his knowledge of what happened in the initial interview?

**[DET. SNEAD]:** The initial interview, I believe he said he was out there and - -

**[APPELLANT'S COUNSEL]:** Objection. Hearsay.

**THE COURT:** Overruled. You can answer counsel — Detective.

**[DET. SNEAD]:** Yes, sir. He said he was out there but he didn't make any observations.

**[THE STATE]:** Okay. So, he acknowledged his presence, denied being an eye witness, is that fair to say?

**[DET. SNEAD]:** Yes, sir.

**[THE STATE]:** Okay. And couple days later on July 7th, Mr. Campbell came back for a second interview, is that fair to say.

**[DET. SNEAD]:** Yes.

. . . .

**[THE STATE]:** Mr. Campbell never actually said in the July 7th interview he lied. His characterization was that he had not said everything because he was scared.

**[DET. SNEAD]:** So, he said that he didn't say everything because he was scared but toward the end —

**THE COURT:** Would you let him — Counsel, would you let him testify.

**[DEFENSE COUNSEL]:** Okay.

**THE COURT:** Thank you.

**[DET. SNEAD]:** He said, I lied because I was scared.

. . . .

40

**[THE STATE]:** All right. Now having reviewed [the transcript of Campbell's second interview], do you agree the Mr. Campbell never actually used the word lied.

**[DET. SNEAD]:** Right.

**[THE STATE]:** His words were, he didn't tell all of it, is that correct?

**[DET. SNEAD]:** Uh, yes.

. . . .

**[THE STATE]:** So, Mr. Campbell came back on or about July 7th with more information than just I was out there and didn't see anything. Is that fair to say?

**[DET. SNEAD]:** Yes, sir.

**[THE STATE]:** Okay. And the reason why he was coming back a second day was because according to him he was afraid.

**[DET. SNEAD]:** Yes.

**[THE STATE]:** How much more information was Mr. Campbell able to give you a second interview.

**[DEFENSE COUNSEL]:** Objection.

**THE COURT:** Overruled.

**[DET. SNEAD]:** He was able to give —

**[DEFENSE COUNSEL]:** Objection, Your Honor. Hearsay. . . .

**[PROSECUTOR]:** I offer it for the truth.

**THE COURT:** Overruled.

. . . .

**[DET. SNEAD]:** Yes, sir. He was able to give a significant amount of information.

## A. Parties' Contentions

Appellant contends that the Circuit Court erred in allowing Det. Snead to testify about Campbell's statements to police. Appellant notes that the prosecutor for the State said he was offering the Statements "for the truth." Appellant argues that Campbell's statements were inadmissible hearsay and that they violated his right to confrontation

41

"because the statements were testimonial and Appellant was denied the ability to cross-examine Campbell." Further, Appellant contends that admission of Campbell's statements was not harmless "because they corroborated the testimony of other witnesses who suffered severe credibility issues."

In response, the State contends that Det. Snead was allowed to testify about Campbell's statements for non hearsay purposes – to explain his personal impression of those statements. Namely, the State argues that the purpose of Det. Snead's testimony was to "ascertain whether Snead's characterization of Campbell's explanation as to why Campbell came forward on July 7 was because Campbell said he lied in the July 3 statement (as Snead testified on cross), or because Snead interpreted what Campbell said as an admission by Campbell that he lied in the July 3 statement." The State notes that the Circuit Court's closing instructions "told the jury that Horsey, Boyd and Waddell had given out-of-court statements that it could consider substantively but did not include Campbell's July 7 statement as a statement the jury could consider in the same manner." The State argues that this showed that the Circuit Court did not believe that Campbell's statements were being offered for their truth. Finally, the State argues that even if the statements were offered for their truth, the Circuit Court did not err in admitting the statements because Appellant opened the door to the inquiry when Appellant, during cross examination of Det. Snead, "intimated Campbell lied in his July 3 statement."

## B. Standard of Review

In general, a trial court has broad discretion when deciding on admissibility of evidence. However, "under the rules of evidence, hearsay rulings are not discretionary[,]"

42

and a trial court must exclude hearsay that does not fall "within an exception to the hearsay rule excluding such evidence." *See Gordon*, 431 Md. at 535. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Md. Rule 5-801(c). "Whether evidence is hearsay is an issue of law reviewed de novo." *Parker v. State*, 408 Md. 428, 436 (2009). However, the Court of Appeals has explained that "not all aspects of a hearsay ruling need be purely legal." *Gordon*, 431 Md. at 536. In *Gordon*, the Court of Appeals explained

> A hearsay ruling may involve several layers of analysis. Proponents of the evidence challenged on hearsay grounds usually argue (1) that the evidence at issue is not hearsay, and even if it is, (2) that it is nevertheless admissible. The first inquiry is legal in nature. But the second issue may require the trial court to make both factual and legal findings.

*Id*. (Internal citations omitted). Thus, when examining a trial court's decision to admit hearsay under an exception, we review that decision for abuse of discretion or clear error if it involves factual or discretionary determinations.

## C. Analysis

We need not decide whether the Det. Snead's testimony was hearsay in this case because we hold that the evidence was nonetheless admissible. Assuming *arguendo* that Det. Snead's characterization of Campbell's statements was hearsay, Det. Snead's testimony was nevertheless admissible because Appellant opened the door to the inquiry. In *Conyers v. State*, the Court of Appeals explained the "opening the door" exception to admissibility of hearsay statements as follows:

> "Opening the door" is a rule of expanded relevancy; it allows the admission of evidence that is competent, but otherwise irrelevant, in order to respond to evidence introduced by the opposing party during its direct examination.

43

Whether the opponent's evidence was admissible evidence that injected an issue into the case or inadmissible evidence that the court admitted over objection, once the "door has been opened" a party must, in fairness, be allowed to respond to that evidence. In other words, the doctrine makes relevant what was irrelevant before opposing counsel's direct examination.

345 Md. 525, 545-46 (internal citations omitted).

Accordingly, when a defendant generates a hearsay issue on cross-examination, the State is permitted to rebut that issue on redirect with reference to the same alleged hearsay statement. In *Trimble v. State*, a defendant objected on hearsay grounds when the State asked a testifying physician about a non-testifying physician's previous diagnosis. 300 Md. 387 (1984). The defendant argued that allowing testimony was "tantamount to having [the testifying physician] testify as to [the non-testifying physician's] opinion . . . ." *Id*. at 402. However, the Court of Appeals held that the testifying physician's testimony was admissible because the defendant had "opened the door to such testimony by eliciting from [the testifying physician] the inference that [the non-testifying physician] had prescribed Thorazine" for the defendant because the defendant was psychotic. *Id*. Thus, the Court reasoned that "[d]efense counsel, having created the issue, cannot now be heard to complain that the State sought to rebut its significance." *Id*. at 403. As in *Trimble*, in the present case, Appellant generated the issue of Campbell's truthfulness to police – and Det. Snead's characterization of the same – and the State was permitted to rebut its significance by allowing Det. Snead to explain his characterization with reference to Campbell's interviews.

In the case *sub judice*, the State was responding to an issue Appellant generated – Appellant's assertion that Campbell said he lied to police in his first interview. In doing

so, the State sought to explain the reason for Campbell's second interview with police, and Det. Snead's understanding of that reason. The Circuit Court acted within its discretion in allowing the State to rebut Appellant's assertion that Campbell lied to police in his first interview. Accordingly, we hold that the Circuit Court did not abuse its discretion in allowing Det. Snead to testify about Campbell's statements to police.

## V. *Prosecutor's Statements during closing argument and rebuttal.*

### A. Parties' Contentions

Appellant first contends that the Prosecutor representing the State made several impermissible statements during the State's closing argument and rebuttal. First, Appellant argues that the State impermissibly vouched for the credibility of Jermaine Lee by commenting during closing argument "that Lee's testimony was 'real,' 'raw,' and 'pure[.]'" In response, the State asserts that "Maryland courts have []squarely held that although vouching for a witness's credibility is improper, '[t]he rule against vouching does not preclude a prosecutor from addressing the credibility of witnesses in closing argument.'" (Quoting *Small v. State*, 235 Md. App. 648, 698 (2018), *aff'd on other grounds*, 464 Md. 68 (2019)).

Second, Appellant contends that, during rebuttal, the State "vouched for the unimportance of the witnesses that the State failed to call, and implicitly commented on facts not in evidence." Namely, when Appellant noted during closing argument that the State did not call multiple witnesses who were involved in the Incident, the State rebutted by noting that "the defense can call witnesses if they want to." Following Appellant's overruled objection, the State clarified that "[i]t's [the State's] burden of proof, [we] have

to prove the case beyond a reasonable doubt[]"; but continued to say that "if the insinuation is that we didn't call these people but there's something important that they have to say, it would have come out in this trial." Appellant argues that this last statement by the State prosecutor "personally vouch[ed] for [the State's] selection of evidence and convey[ed] the unimportance of facts not in evidence." Moreover, Appellant argues that the prosecutor's statement shifted the burden of proof by "invit[ing] the jury to hold Appellant responsible for the absence of witnesses." In response, the State contends that the prosecutor's statements did not, as Appellant claims, argue facts not in evidence or improperly shift the burden of proof. In support, the State notes that the Court of Appeals has held that it is appropriate for a prosecutor to remind jurors that a defendant has the right to compulsory process and could have subpoenaed witnesses after a defendant argues that such witnesses were missing from the prosecutor's case. (Citing *Mitchell v. State*, 408 Md. 368, 368-69 (2009)). Further, in response to Appellant's contention that the State impermissibly shifted the burden of proof, the State argues that the prosecutor's statement – that if the witnesses Appellant referenced in closing had any important information they would have been called to testify – was "no more than rhetorical flourish." The State argues that, because "reversal is only required where it appears that the remarks of the prosecutor actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused," reversal is inappropriate here because the prosecutor's statement was not likely to have misled or influenced the jury to the prejudice of Appellant.

Finally, Appellant argues that the State "encouraged the jury to decide the case based on emotion." Specifically, Appellant refers to the prosecutor's statements that the

46

jury could not "fix [the] situation [because a] man is dead[,]" but that "the message that the [jury] need[ed] to send to [Appellant] is that this kind of activity will not be tolerated." In response, the State asserts that "[r]eminding the jurors of their responsibility is not an invitation to disregard their oaths." Likewise, the State argues that the prosecutor's statements were not an appeal to emotion, but simply a response to defense counsels' statement that the jury "ha[d] all the power," and that the prosecutor was reminding that jury that such power came with a "responsibility."

## B. Standard of Review

It is well settled that "a trial court has broad discretion when determining the scope of closing argument." *Cagle v. State*, 462 Md. 67, 75 (2018) (Citing *Ware v. State*, 360 Md. 650, 682 (2000)). In *Carroll v. State*, 240 Md. App. 629 (2019), we elaborated on the discretion of the trial court in determining the scope of oral argument:

> What exceeds the limits of permissible comment or argument by counsel depends on the facts of each case. Thus, the propriety of prosecutorial argument must be decided contextually, on a case-by-case basis. Because a trial court is in the best position to evaluate the propriety of a closing argument as it relates to the evidence adduced in a case, the exercise of its broad discretion to regulate closing argument will not be overturned unless there is a clear abuse of discretion that likely injured a party.

*Carol*, 240 Md. App. at 663 (internal citations and quotation marks omitted). Moreover, a trial court exercises such discretion with the understanding that "a party holds great leeway when presenting their closing remarks." *Cagle*, 462 Md. at 75.

## C. Analysis

Appellant first contends that the State prosecutor impermissibly vouched for the credibility of Jermaine Lee when he characterized Lee's testimony as "real," "raw," and

47

"pure."[12] We disagree. In *Small v. State*, we explained that "although vouching for a witness's credibility is improper, '[t]he rule against vouching does not preclude a prosecutor from addressing the credibility of witnesses in closing argument.'" 235 Md. App. 648, 698 (2018) (Quoting *Sivells v. State*, 196 Md. App. 254, 277 (2010)). In *Spain v. State*, the Court of Appeals discussed the limits of vouching for a witness during closing arguments as follows:

> No one likely would quarrel with the notion that assessing the credibility of witnesses during a criminal trial is often a transcendent factor in the factfinder's decision whether to convict or acquit a defendant. During opening and closing arguments, therefore, it is common and permissible generally for the prosecutor and defense counsel to comment on, or attack, the credibility of the witnesses presented.
>
> . . . .
>
> Attorneys . . . feel compelled frequently to comment on the motives, or absence thereof, that a witness may have for testifying in a particular way, so long as those conclusions may be inferred from the evidence introduced and admitted at trial. *See*, *e.g.*, *U.S. v. Walker*, 155 F.3d 180, 187 (3rd Cir.1998) (finding that "where a prosecutor argues that a witness is being truthful based on the testimony given at trial, and does not assure the jury that the credibility of the witness based on his own personal knowledge, the prosecutor is engaging in proper argument and is not vouching").

386 Md. 145, 154-55 (2005). Here, the prosecutor's comments about Lee's testimony did not constitute assurances based on the prosecutor's personal knowledge, nor did they exceed the permissible bounds of the prosecutor's ability to comment on the credibility of the witnesses presented. While his use of the term "pure" is interesting, he is not vouching for the testimony.

---

[12]     *See* Jermaine Lee factual background *supra* at 9-10.

Next, Appellant contends that the State prosecutor vouched for the unimportance of the witnesses that the State failed to call, and implicitly commented on facts not in evidence, with the following comments on rebuttal:

> **[THE STATE]:** …And this comment about all these other witnesses that the State should have produced. You saw that the defense can call witnesses if they want to.
>
> **[APPELLANT'S COUNSEL]:** Objection.
>
> **THE COURT:** Overruled.
>
> **[THE STATE]:** They called Gregory Steward, that's a police personnel. Now let me just clarify something, the burden is on me, right. It's my burden of proof, I have to prove the case beyond a reasonable doubt. I'm not saying they have to do anything. They could sit there all day and do nothing. What I'm saying is if the insinuation is that we didn't call these people but there's something important that they have to say, it would have come out in this trial. That's my point.

In *Mitchell v. State*, the Court of Appeals held that when a defendant "opens the door" by calling attention to the failure for the State to call witnesses, the State is permitted to respond by calling attention to the defense's ability to call those same witnesses to testify. 408 Md. 368, 387-88 (2009). Accordingly, in the case *sub judice*, when Appellant commented on the failure of the State to call certain witnesses, the State was permitted to note that Appellant could "call witnesses if [he] want[ed] to."

Conversely, the State prosecutor went beyond simply noting the defense's subpoena power when he commented that if the missing witnesses had "something important that they have to say, it would have come out in this trial." Thus, we must decide whether the prosecutor's comment was more properly characterized as "prejudicial or rhetorical flourish." *See Degren v. State*, 352 Md. 400, 341 (1999) (Noting that the determination of

49

whether a prosecutor's comments were prejudicial, rather than simply rhetorical flourish, lies within the sound discretion of the trial court; and that "an appellate court should not reverse the trial court unless that court clearly abused the exercise of its discretion and prejudiced the accused."). Here, the trial court clearly viewed the prosecutor's statement as a rhetorical flourish. Although the comment did exceed the permissible bounds of rebuttal, the fact that the prosecutor prefaced his comment with the proper articulation of the burden of proof and production helped to ameliorate the potential prejudice of the prosecutor's statements. While that alone is not sufficient to cleanse any potential prejudice, the prosecutor's remark was isolated – not further compounded – and in response to an issue raised by Appellant. We cannot say that the trial court clearly abused its discretion in allowing the comment to stand as a rhetorical flourish. *Accord Hill v. State*, 355 Md. 206, 208 (1999) ("Even when a clearly improper remark is made, a mistrial is not necessarily required."). The trial court was in the best position to assess the potential prejudice of the prosecutor's comment, and we will not disturb the trial court's determination on appeal.

Finally, we address Appellant's contention that the State "encouraged the jury to decide the case based on emotion." Namely, Appellant takes issue with the following portion of the State's rebuttal:

> **[THE STATE]:** . . . [Defense counsel] talked about these other systems. She talked about child support. I want you to ask yourself what criminal justice is.
>
> **[APPELLANT'S COUNSEL]:** Objection.
>
> **THE COURT:** Overruled.

50

**[THE STATE]:** I want you to ask yourself. Because for a brief moment in time, as she said, you're the ones who are going to have all the power. I think justice is taking something wrong and making it right.

**[APPELLANT'S COUNSEL]:** Objection.

**THE COURT:** Overruled.

**[THE STATE]:** But how do you do this. This isn't a theft case where something got stolen and you just pay it back. It's not a broken window where you go buy a new one. This is somebody's life. And the sad reality is you can't fix it. You cannot fix this situation. A man is dead, --

**[APPELLANT'S COUNSEL]:** Objection.

**[THE STATE]:** – he's not coming back.

**THE COURT:** Overruled.

**[THE STATE]:** So I want you to ask yourself what this means and I think the answer is responsibility. I think the message that the twelve of you need to send to [Appellant] is that this kind of activity will not be tolerated.

**[APPELLANT'S COUNSEL]:** Objection to message, Your Honor.

**THE COURT:** Overruled.

**[THE STATE]:** These actions have consequences and I'm asking you to deliver them.

Appellant likens this case to *Hill*, 355 Md. 206. In *Hill*, the prosecutor for the State repeatedly – in opening and closing arguments – stated that the jury needed to "send a message to protect [their] community." *Id*. at 211. The prosecutor commented that the jury needed to do the "thing that protects all of us and keeps this community safe." *Id*. Further the prosecutor asserted that the defendant would "go back and tell his cronies and buddies about what is going on here today." *Id*. at 212. The prosecutor continued to tell

the jury that their community was "in a crisis," even going so far as to say "[p]eople wonder why we can't get 4–star restaurants here." *Id*. The prosecutor then answered that it was because of "[p]eople like [the defendant]." *Id*. Finally, the prosecutor finished with a series of loaded questions: "Will [the defendant] be held accountable, or is it okay to say, do what you want? It's your community. No, it's not your community; it's our community. This is your turn to do something about it." *Id*.

The prosecutor's statements in the present case seem a far cry from the prejudicial statement's allowed in *Hill*. Here, the prosecutor spoke of justice as it related to the crime at issue; and spoke of the jury's responsibility in response to Appellant's closing remark that the jury had "all the power." Conversely, in *Hill*, the prosecutor appealed to the jury's concern for their community and the potential effect their decision would have on the safety and amenities of their community in the future. Thus, we do not view *Hill* as applicable to the facts of this case.

Notwithstanding the absence of any appeal to the jury's interest in the safety of their community, Appellant cites language from *Lee v. State*, 405 Md. 148 (2008). *Lee* involved a series of comments by a prosecutor which, like the comments in *Hill*, appealed to the jury's interest in the safety of their community.[13] *Id*. at 139. After holding that the comments were improper, the Court of Appeals opined that

---

[13] In one such comment, the prosecutor in *Lee* stated:

Do the residents of that area have the right to be able to be safe in their environment? I ask and those residents ask that you teach this defendant . . . that disputes aren't settled by the blast of a gun, teach the defendant that pulling a trigger doesn't make you a man, it makes you a criminal . . . .

52

> [e]ven if the prosecutor's comments were directed such that the jurors were asked to teach [the defendant] a lesson, and not to send a message to the entire community, these comments were improper because they asked the jury to view the evidence in this case, not objectively, but consonant with the juror's personal interests.

*Id*. at 140. We do not view this language as dispositive given the crucial distinction between the prosecutor's comments in this case and the comments present in *Hill* and *Lee*. In both *Hill* and *Lee*, the prosecutors asked the jury to decide the case in the manner that was best for the safety of their community. In both cases, the prosecutor essentially asked the jury to use their decision to "clean up the streets." In *Lee*, while the prosecutor may have asked the jury to send a message to the defendant, not the community at large, the prosecutor did so in the context of keeping their community safe.

Here, the prosecutor made no such appeal to community impact or community safety in connection to the jury's decision. The language in *Lee* which Appellant relies upon seems to suggest that an appeal to a jury's interest in a safe community is not cured by a subsequent request that the jury send a message to the defendant. However, it does not necessarily follow that any request for a jury to send a message to a defendant is thereby improper absent any appeal to the jury's interest in a safe community. The determination depends on the facts and circumstances of the case. In the present case, while the prosecutor did ask the jury to send a message to the defendant, the prosecutor did not appeal to the jury's interest in a safe community.

---

*Id*. at 158.

53

This case does not involve the type of prejudicial appeals to the jury present in either *Hill* or *Lee*. Moreover, the prosecutor's comments related to "justice," and how it could be accomplished in the case before the jury. This is yet another form of rhetorical flourish that a prosecutor has leeway to pursue during closing arguments. Thus, we hold that the trial court did not abuse its discretion in allowing the prosecutor's comments during closing argument.

## VI. Unpropounded voir dire question asking whether prospective jurors had strong feelings about illegal drugs.

### A. Parties' Contentions

In his final issue raised on appeal, Appellant contends that the trial court erred by declining to propound his proposed voir dire question which sought to ask whether prospective jurors had strong feelings about drugs. Appellant argues that the proposed question was directed at uncovering juror biases related to the collateral drug related matters underlying the murder charge, and that failure to ask the question constituted reversible error.

In response, the State initially argues that Appellant did not properly preserve the issue for appeal, and even if he did, he waived any right to raise the issue after his unqualified acceptance of the jury as empaneled at the close of voir dire. Moreover, the State notes that Appellant was not charged with any drug related crime. Accordingly, the State contends that, because Appellant's proposed question was not targeted at uncovering bias relating to the crimes charged, the trial court did not err in declining to propound

54

Appellant's question.

## B. Standard of Review

"An appellate court reviews for abuse of discretion a trial court's decision as to whether to ask a voir dire question." *Pearson v. State*, 437 Md. 350, 356 (2014) (citing *Washington v. State*, 425 Md. 306, 314 (2012)). Because Maryland employs a "limited voir dire" process "a trial court need not ask a voir dire question that is 'not directed at a specific cause for disqualification or is merely fishing for information to assist in the exercise of peremptory challenges.'" *Pearson*, 437 Md. at 357 (internal quotation marks and brackets omitted) (quoting *Washington*, 425 Md. at 315).

## C. Analysis

During voir dire, Appellant objected to the court's refusal to propound certain questions during the following exchange:

> **[APPELLANT'S COUNSEL]:** We would like the Court to ask . . . [h]as anybody been a victim witness, convicted of a crime or any other experience in the criminal justice system that would affect your ability to sit fairly and impartially.
> . . . .
>
> . . . I also wanted the Court to ask it in more plain language. Does anybody have any such strong feelings about guns, drugs or violence? The way the Court phrased it was the charges and it's really the topic that we're trying to get at. So that's concerning to me if people are not highly educated or don't understand use of a handgun or wear, carrying, transporting. It's really just, do you have strong feelings about guns and drugs because that's what this case is about. And so, rephrasing it in a way that the average person would understand.
>
> Those are our objections . . . .
>
> **THE COURT:** Thank you and I'll overrule the objections. Thank you.
>
> **[THE STATE]:** Your Honor, may I be heard on just two points?

55

**THE COURT:** Yes.

**[THE STATE]:** The question about the victim of the crime, witness to a crime, family members, victim, witness, I think that question has to be asked and the State would join in the request. . . . And then [Appellant] counsel's request to specifically ask about strong feelings about guns. The drug part, I don't care about that, but guns I think also has to be asked. So I would join in that.

. . . .

**[APPELLANT'S COUNSEL]:** I don't agree with counsel that the Court has to ask the victim witness question. I think the Court has to ask the strong feelings question. So there's two things; one is how we ask the strong feelings question and two, whether the Court has to ask the victim witness. Candidly, I don't think the Court is instructed, . . . and I don't believe that the Court absolutely has to. We think in an abundance of caution, it's a good question to ask especially in this jurisdiction. I know the Court has to ask the strong feelings question. And I think what we're both saying, counsel and the State are joining in, I don't know that the strong feelings question, the way it was phrased, reaches the issue the way the case law would require it to.

**THE COURT:** Two of them have to be always asked; the strong feelings about guns and have any member of the jury panel's family member or close friends ever been a witness for the State in a criminal case, been convicted of a crime, or been a victim of a crime. So that always has to be there.

. . . .

I'm going to ask those two questions. . .

It is clear from this exchange that the trial court was concerned with narrowing the "strong feelings" questions to questions that directly related to the crimes charged. Because Appellant was not charged with any drug related offenses, the trial court declined to ask prospective jurors whether they had strong feelings about drugs. Regardless, Appellant contends that the question was necessary because "drug distribution was inextricably linked to the State's theory of the case."

In *Pearson v. State*, the Court of Appeals explained the two categories of mandatory voir dire questions as follows:

> On request, a trial court must ask a voir dire question if and only if the voir dire question is reasonably likely to reveal specific cause for disqualification. There are two categories of specific cause for disqualification: (1) a statute disqualifies a prospective juror; or (2) a collateral matter is reasonably liable to have undue influence over a prospective juror. The latter category is comprised of biases directly related to the crime, the witnesses, or the defendant.

437 Md. 350, 357 (2014) (internal quotations, citations, and brackets omitted). Appellant argues that his proposed question, asking whether prospective jurors had strong feelings about drugs, was mandatory under the latter category. We disagree.

In *Pearson*, the Court of Appeals ultimately held that "on request, a trial court must ask during voir dire whether any prospective juror has 'strong feelings' about the crime with which the defendant is charged." 437 Md. at 363. Appellant insists that the present case was inextricably linked to drugs because "State's evidence painted Appellant as a player who was involved in a war between two rival drug-distribution organizations, with the rivalry providing the motive for the murder." Additionally, Appellant notes that Horsey testified that Appellant "bought drugs from him shortly before the shooting on Port Street and continued to buy drugs from him until he was arrested." This case certainly included references to drugs. However, those references did not specifically relate to any of the crimes with which Appellant was charged. Accordingly, Appellant's proposed question was not within the universe of voir dire questions which a trial court, on request, *must* ask. We therefore reject Appellant's claim that the trial court erred as a matter of law in declining to propound the question.

Thus, because Appellant's proposed voir dire question was not related to jurors' strong feelings about the crime with which Appellant was charged, we hold that the trial court did not err in declining to propound Appellant's proposed voir dire question.

CONCLUSION

In sum, we hold: (1) the trial court erred in declining to take judicial notice of Waddell's prior conviction, but that error was harmless beyond a reasonable doubt; (2) the trial court did not abuse its discretion in allowing specially relevant testimony which implicated Appellant's involvement in two additional murders; (3) the trial court did not abuse its discretion in allowing the jury to view footage of Waddell and Horsey's prior testimony without redacting the phrase "ladies and gentlemen of the jury"; (4) the trial court did not abuse its discretion by allowing Det. Snead to testify to statements made by Campbell; (5) the trial court did not abuse its discretion by allowing the challenged statements, made by prosecutors for the State during closing argument/rebuttal; and (6) the trial court did not abuse its discretion by declining to propound Appellant's proposed voir dire question asking whether prospective jurors had strong feelings about illegal drugs.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANT.**